# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ACORN, et al., | : | |
| | : | |
| Plaintiffs, | : | NO. 3:04CV1624(MRK) |
| | : | |
| v. | : | |
| | : | |
| SUSAN BYSIEWICZ, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OF DECISION</u>

In this action, Plaintiffs – two individual voters, a political party, and various public interest groups – claim that Connecticut's election law violates their First and Fourteenth Amendment rights to equal protection, to vote, to associate, and to engage in political speech, because Connecticut requires voters who wish to cast a ballot for non-presidential offices to register to vote in advance of election day. Importantly, Plaintiffs do not assert in this case that Connecticut's pre-election-day registration requirement invidiously discriminates against any group. Nor do Plaintiffs claim that requiring voters to register to vote is itself unconstitutional. Instead, Plaintiffs argue that requiring Connecticut's voters to register any time before election day is unconstitutional. According to Plaintiffs, the United States Constitution guarantees the citizens of Connecticut the right to register to vote on the same day as they cast their ballots – a concept known among political scientists and election officials as "election-day registration."

Connecticut is not alone in requiring voters to register to vote in advance of election day; forty-two other states require pre-election-day registration. However, Connecticut's registration requirement is unique in one important respect. Connecticut currently allows voters to register

closer to election day than *any* other state that requires pre-election-day registration – up to seven days before a general election and one day before a primary. Most other states requiring pre-election-day registration require their citizens to register to vote three to four weeks before a general election. Therefore, if Connecticut's shortest-in-the-nation pre-election-day registration requirement cannot pass constitutional muster, it is doubtful that any state's can.

This Court does not write on a clean slate regarding state regulation of the time, place, and manner of exercising the right to vote. In fact, the Supreme Court has explicitly and repeatedly upheld state regulations requiring voters to register to vote in advance of general and primary elections, and has endorsed laws imposing much lengthier deadlines than Connecticut's. Moreover, contrary to Plaintiffs' claim in this case, the Supreme Court has expressly held that "a person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot." *Marston v. Lewis*, 410 U.S. 679, 680 (1973). Nevertheless, Plaintiffs insist that this Court can ignore these Supreme Court holdings because (they claim) the record in this case is much more developed than in the cases the Supreme Court considered, and the evidence shows that Connecticut's pre-election registration requirement is unjustified and unduly burdensome.

Plaintiffs are wrong for two fundamental reasons. First, this Court cannot ignore governing Supreme Court precedent in the manner suggested by Plaintiffs. The Supreme Court's decisions (and there are several) are directly on point, their rulings are crystal clear, and their holdings remain good law, some having been cited with approval by the Supreme Court as recently as last Term.

Second, even if the Court could wish away these decisions, Plaintiffs have not satisfied the Supreme Court's standards for evaluating the constitutionality of state restrictions on voting.

In recent years, the Supreme Court has clarified that such restrictions are subject to differing levels of scrutiny depending upon the severity of the burden imposed. Restrictions on voting that invidiously discriminate or constitute a *severe* burden on First and Fourteenth Amendment rights are subject to strict scrutiny. However, when a restriction on voting is reasonable and nondiscriminatory – and that is the case here – a state's important regulatory interests ordinarily are sufficient to justify the requirement.

Plaintiffs do not claim that Connecticut's seven-day registration deadline invidiously discriminates against any group, and the Court is convinced that it is not a severe burden on voting. It is the shortest pre-election-day registration deadline in the nation, and it is sufficiently easy to comply with that over two million voters in Connecticut – approximately 75% of the voting-age population of the State – successfully registered to vote in 2000 and 2004. Connecticut law permits citizens to register by mail or in person. Mail-in applications are readily available. In fact, state law requires the Commissioner of Motor Vehicles to include an application for voter registration with each application for an operator's license or renewal.  Those voters wishing to register in person can do so not only at registrar of voters' offices in each of Connecticut's 169 towns but also at myriad other locations including libraries, motor vehicle offices, state universities, and state assistance offices. Citizens can also register to vote during the many privately run voter registration drives held in numerous locations throughout the State in the weeks leading up to each election. The registration process itself takes about one minute of a citizen's time and, once registered, a Connecticut citizen can vote in all subsequent elections without re-registering unless the citizen moves to a different town. Importantly, to register, Connecticut citizens need not decide for whom to vote, or even whether to vote on election day;

3

they need only decide, a mere seven days in advance of a general election, that they wish to preserve the option of voting a week later.

Although it may be true that registering in advance is not as convenient as registering on election day, requiring citizens to take one or two minutes of their time to register to vote seven days before a general election cannot reasonably be characterized as a *severe* burden on the right to vote. Over thirty years ago, Justice Stewart, writing for the Supreme Court, upheld the constitutionality of a registration requirement that was far more onerous than Connecticut's, and his words in that case aptly sum up this case as well. By requiring voters to register in advance of election day, Connecticut "d[oes] not prohibit the petitioners from voting . . . or from associating with the political party of their choice. It merely impose[s] a legitimate time limitation on their enrollment, which [unregistered voters] cho[o]se to disregard." *Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973).

Thus, because Connecticut's registration deadline is neither discriminatory nor severe, to withstand constitutional challenge it need only serve important regulatory interests. That standard was more than met here. As the evidence in this case showed, Connecticut's pre-election registration requirement is amply justified by several important and legitimate state interests, including the State's interest in minimizing voter fraud (as well as the perception of a vulnerability to fraud) and in avoiding confusion and chaos on election day itself.

It bears particular emphasis that the representatives of the people of Connecticut have not lightly rejected the concept of election-day registration. The General Assembly has long considered the question of registration deadlines and whether to adopt for Connecticut the election-day registration scheme that only six other states have endorsed. Over the years, the state legislature has held numerous and lengthy hearings on this topic, has heard from interested

4

groups, citizens, and public officials about the pros and cons of election-day registration, and has debated its merits in committees and on the floor of the General Assembly. As a result of this deliberative process, the General Assembly has carefully but significantly reduced the length of time between registration and election day. Indeed, Connecticut's current seven-day pre-election registration deadline for casting a vote in non-presidential general-election races is the most liberal pre-election-day registration deadline in the nation, and the eighth most liberal registration requirement overall, right behind the six states that allow election-day registration and the single state that imposes no voter registration requirement at all. Having carefully considered bills introducing election-day registration every year since 2001, and after consultation with the Secretary of the State, the Attorney General, the State Elections Enforcement Committee, the Registrar of Voters Association of Connecticut, and numerous others, the Connecticut General Assembly has apparently decided that, whatever benefits election-day registration might provide in terms of increasing voter turnout, those benefits are, at least for now, outweighed by the State's interests in minimizing fraud, crowding, and confusion at the polls. That is a choice, the Court notes once again, that forty-two other state legislatures have also made.

Dissatisfied with the result of this legislative balancing of interests, proponents of election-day registration now turn to an unelected federal judge to achieve what they have been unable to obtain from state legislatures. Plaintiffs ask this Court to re-weigh the competing public interests – in Learned Hand's famous words, to assume the role of a "third legislative chamber" – and impose election-day registration by *fiat* upon the citizens of Connecticut. But striking the appropriate balance between promoting smooth and accurate elections, on the one hand, and encouraging voter turnout, on the other, is "quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly

awry." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004). With all due respect to Plaintiffs –

who have the best of intentions and have worked very hard to promote a concept about which

they are clearly passionate – the judgment of Connecticut's legislature with respect to election-day

registration is not even remotely close to "grossly awry," and "[t]he Constitution is not so rigid

that that determination and others like it may not stand." *Marston*, 410 U.S. at 681.

## I.

This case was tried to the Court over the course of several days, with an additional day for

extended oral argument. The parties also provided the Court with pre-trial and post-trial briefing,

including a lengthy stipulation of facts, proposed findings, and extensive pre-filed testimony.[1] The

Court was fortunate to have superb counsel working on this case. Every attorney who worked on

this case, from the most experienced to the least, demonstrated time and again the very highest

standards of skill, hard work, cooperation, candor, and professionalism. The Court is grateful to

counsel and commends them for their superior legal work. It was truly a pleasure working with

them on this important matter.

This Memorandum of Decision will serve as the Court's findings of fact and conclusions

of law in accordance with Rule 52 of the *Federal Rules of Civil Procedure*. Emblematic of the

parties' cooperation in this case, their Statement of Stipulated Facts [doc. #61, Ex. A] ("Stip") is

67 pages long and consists of 416 separately numbered paragraphs. The Court has not repeated in

this Memorandum each of those 416 stipulations of fact but instead has highlighted only those

---

[1]   The trial lasted five days (April 28-29, May 2, 18, and 27, 2005), and oral argument was
held on June 29, 2005.  *See* Minute Entries [docs. ## 70-72, 76, 78, 93]. In addition, the parties
submitted the following materials: Joint Pre-Trial Memorandum [doc. #61], including, at Exhibit A,
the Joint Stipulation of Facts ("Stip"); Memorandum of Law in Support of Plaintiffs' Request for a
Declaration of Unconstitutionality [doc. #60]; Memorandum of Law Addressing Article III's
Requirement of Redressability and the Secretary of State's Ability to Provide Adequate Relief [doc.
#73]; and Defendant's PreTrial Bench Brief [doc. #62].

facts that the Court finds particularly noteworthy. The Court refers readers to the full Statement for the entire universe of stipulated facts and will assume familiarity with the facts stipulated by the parties.

**The Parties**

Plaintiffs in this action are two individuals (Garvin Roos and Susan Sorensen) one political party (the Working Families Party), and six public interest groups (ACORN, Connecticut Citizen Action Group, Connecticut Common Cause, Connecticut Public Interest Research Group, Connecticut Democracy Works, and People for the American Way).[2] Ms. Sorensen and Mr. Roos are citizens who claim they were prevented by Connecticut's registration deadline from voting for non-presidential offices in the 2004 election. Plaintiff Working Families Party ("WFP") is a minor political party (as that phrase is defined in Connecticut's election laws) that seeks to engage individuals disenchanted by the political status quo and therefore less likely to be frequent, and registered, voters. Voter registration is an integral part of WFP's efforts to promote candidates and the party's agenda. Plaintiff public interest groups are various non-partisan state and national membership organizations and lobbying groups that have a particular interest in the functioning of American democracy, the furtherance of civic participation, and increased voter registration. Connecticut ACORN registered over 5000 voters during the 2004 election cycle. Connecticut Public Interest Research Group is also active in voter registration, with a focus on Connecticut's students.

---

[2] Seven other individual plaintiffs were dismissed from the suit upon oral motion of the Defendant at argument on May 2, 2005. Defendant represented to the Court that she does not contest the standing of the remaining Plaintiffs to bring this suit.

**Connecticut's Current Legal Regime for Elections**

*A.   Overview*

Like forty-nine other states, Connecticut requires its citizens to register before allowing them to vote in either primary or general elections. However, in accordance with federal legislation, Connecticut law provides an exception to the registration requirement for presidential elections: citizens may vote *in presidential races only* without first registering to vote. Conn. Gen. Stat. §§ 9-158a-c. Registration occurs at the town level and is overseen by officials known as registrars of voters, of whom each of Connecticut's 169 towns have two (except Branford, which has four). Thus, although the Secretary of the State is the State's chief election official, she is not empowered to register voters.  Town budgets, and not the State, pay for the wages of registrars of voters as well as poll workers hired for election day.

Any citizen of the State who will have attained the age of eighteen on or before the day of a regular election may apply to register to vote. Registration typically involves completing a simple one-page form that requests standard personal information including name, address, age, citizenship, and date of birth, providing some type of identification, and signing, under penalty of perjury, an affirmation that the registrant is eligible to vote. Registration forms, along with instructions on how to complete them and when and where to submit them, are available from multiple state institutions, and can also be obtained from the Secretary of the State's website or from a registrar of voters office.

Completed registration cards may be returned by mail to a registrar's office, or in person either to numerous state agencies, or to private groups holding voter registration drives. From the various locations to which voters may return their registration cards, the forms are forwarded to the registrar of voters for the applicant's hometown. The local registrar of voters for the town

8

where the applicant resides is tasked with ascertaining that the applicant is qualified to vote, and, if so, sending a notice of acceptance to the applicant. The registrar of voters also electronically records each qualified registrant's information in a statewide electronic database that also generates town-by-town voting lists for local use.

Once properly registered, a citizen is eligible to vote in all subsequent elections without the need to re-register unless the citizen moves to another town. Registration is not completed, however, until the registrar of voters confirms that an application is timely and appropriately authenticated. Details about the timing and authentication requirements for proper registration, various exceptions to the usual registration requirements, the consequences of attempting to evade the registration requirements, and the implementation of the statewide electronic database are provided below.

B.      *Timing of Registration*

In order to vote in a *primary* election, Connecticut voters may register to vote in person until noon on the day before the primary election. Conn. Gen. Stat. § 9-56. However, in order to vote for both presidential and non-presidential offices in a *general* election, voters in Connecticut generally must register to vote at least seven days before the election if registration is done in person, and at least fourteen days before the election if the registration is done by mail. The Court notes that at the time of filing and trial of this lawsuit, the in-person registration deadline was fourteen days before the general election. Conn. Gen. Stat. §§ 9-1, 9-17, 9-23g(d). However, on July 8, 2005, the Governor signed into law Public Act 05-235, Sections 26 and 27 of which extend the period for in-person registration until seven days before the election. *See* Public Act 05-325 §§ 26, 27, 2005 Conn. Pub. Acts 685-86. Because Public Act 05-235 was enacted while

this case was still pending, this Court has assessed the constitutionality of Connecticut's voter registration law by considering the requirements of Public Act 05-235, and not those of prior law.

Connecticut's seven-day deadline for in-person registration is the seventh-most liberal voter registration deadline in the nation: only the six states that allow election-day registration (or "EDR") have shorter deadlines.[3] The relatively short voter registration deadline in Connecticut is the product of two legislative amendments to the election law in the last fifteen years, the Connecticut legislature having reduced the registration deadline from twenty-one days to fourteen days in 1991, and from fourteen days to seven days as recently as July 2005. *See* Public Act 91-352 § 24, 1991 Conn. Pub. Acts 984; Public Act 05-325 §§ 26, 27, 2005 Conn. Pub. Acts 685-86.

Although the seven-day deadline for in-person registration and the fourteen-day deadline for mail-in registration are the defaults, Connecticut law recognizes a variety of exceptions to these deadlines. Under these exceptions, registration of varying degrees of lateness is permitted for various categories of voters, including: 1. "Matured rights" voters (individuals who become 18 years of age, a U.S. citizen, or a resident of a municipality between the fourteenth day before a general election and the last business day before that election) who may register to vote in person until noon on the last week day before the election, Conn. Gen. Stat. § 9-17(b); and 2. Members of the armed forces, including those discharged within the year before an election, who may request in writing to be registered at any time before five p.m. on the last week day before any regular election, Conn. Gen. Stat. § 9-25. In addition, in accordance with federal law, Connecticut allows provisional ballots to be cast by individuals who come to the polls and declare that they are registered and eligible to vote but who cannot be found on or restored to the registration list,

---

[3] *See* United States Election Assistance Commission, State Voter Registration Deadlines *at* http://www.eac.gov/register_vote_deadlines.asp [last visited December 18, 2005]. In addition, the Court notes that one state, North Dakota, does not require voter registration at all.  *Id*.

or cannot provide required identification. *See* 42 U.S.C. § 15482 (codifying part of the Help America Vote Act of 2002); Conn. Gen. Stat. § 9232l.

For prospective voters not falling within the aforementioned exceptions, failure to register by the seventh day before a general election means that they will not be permitted in that election to vote for non-presidential offices, although untimely but otherwise satisfactory applications will be processed and will serve to register a voter for subsequent elections, *see* Stip. ¶ 69. However, as required by the Voting Rights Act of 1965, codified as amended at 42 U.S.C. §§ 1973 to 1973bb-1 (2005), Connecticut permits individuals who move to the State after the registration cutoff to vote without registration for president and vice-president through the device of a presidential ballot. *See* 42 U.S.C. 1973aa-1(e); Conn. Gen. Stat. § 9-158b. In addition, Connecticut has extended the option of voting by presidential ballot to all unregistered voters, not only those who miss the registration deadline due to migration. Conn. Gen. Stat. § 9-158b(a). Furthermore, in 1997, the Connecticut legislature decided to make presidential ballots available to unregistered voters on election day itself, *see* Public Act 97-154 § 6, 1997 Conn. Pub. Acts 347, a system first put into practice during the 2000 presidential election. Thus, in Connecticut, all unregistered voters can cast ballots on election day for president and vice-president. Conn. Gen. Stat. § 9-158c. Presidential ballots are counted in accordance with the rules on absentee ballots. Voting by presidential ballot does not serve to register the voter, although all those voting by presidential ballot are also offered the opportunity to register to vote, and if they do register, they will be permitted to vote for all races in the next election.

C.    *Authentication of Voter Identity*

Identification requirements are an integral part of the State's effort to prevent voter fraud, and are deployed both at registration and at the polls. However, not all voters are subject to the

same identification requirements: the type of identification that a voter must provide varies with the method and time of registration.

Recently enacted federal legislation, the Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 (codified in scattered sections of 42 U.S.C.) ("HAVA"), imposes special identification requirements on individuals whose first voter registration is submitted by mail. *See* 42 U.S.C. § 15483(b)(1)-(2). In accordance with HAVA, Connecticut requires first-time mail-in registrants to provide, either with their registration application or at the polls, one of the following forms of identification: a current valid photo-identification; or a current utility bill, bank statement, government check, paycheck, or other government document showing the person's name and address. Conn. Gen. Stat. § 9-23r. The same identification requirements imposed on first-time mail-in registrants also apply to unregistered voters seeking to cast a presidential ballot. Conn. Gen. Stat. § 9-158e.

Voters who register for the second or subsequent time by mail are not required to present any identification with the registration application. Conn. Gen. Stat. §§ 9-23h, 9-23r. Voters who register in person must present a birth certificate, driver's license or Social Security card, *see id*. §9-20(a), but if that identification is not available, registration will be accepted if the voter proves her identity and eligibility by sworn testimony, or by other proof acceptable to the admitting official, *see id*. § 9-20(a). However, at the polls, all voters must present a Social Security card, or other form of preprinted identification (like a drivers' license) displaying the voter's name, address, and photograph or signature. *See id*. § 9-261(a)(2)(A). If the voter is unable to present that identification at the polls, she will still be allowed to vote provided that she submits a sworn declaration that she is the voter whose name appears on the official registration list. *See id*. § 9-261(a)(2)(B). At trial, Mr. Richard Abbate, the President of the Registrar of Voters Association of

Connecticut (Registrars' Association) testified that this provision of Connecticut law – allowing a voter to substitute a declaration of identity for actual identification – is a major concern for registrars with respect to voter fraud.

In addition to verifying identity by requiring voters to present identification or sign sworn statements as to name, age, and eligibility, Connecticut registrars are required to verify the address of a mail-in applicant by sending out an acceptance letter. If the letter is not returned as undeliverable, the presumptively successful delivery is taken as evidence of the voter's identity. If the acceptance letter is returned undeliverable, the registrar will follow up by phone, and if that does not succeed, the registrar will send an official "confirmation of voter address" letter. If the confirmation of voter address letter is also returned undeliverable, the voter is designated inactive, but may apply for reinstatement even at the polls. *See id*. §§   9-23g(c), 9-35. Although this verification process is only required for mail-in applicants, Mr. Abbate testified at trial that the same process is widely followed for in-person registrants, and that he considers it helpful in preventing voter fraud. The Executive Director of the State Elections Enforcement Commission ("Elections Commission"), Mr. Jeffrey Garfield, also testified that voter verification by mail was a useful anti-fraud tool.

State law provides two further methods for maintaining accurate voter lists. Section 9-32 of the Connecticut General Statutes mandates that registrars conduct an annual canvass, whether house-to-house or by mail or by telephone, in order to ascertain changes of address. *Id*. § 9-32. Finally, Connecticut law requires registrars to make a final list of the registered voters for each town available for public inspection at the town clerk's office on the second Friday preceding a general election.  *Id*. § 9-38. Candidates for office may also request a copy of the list, and according to the testimony at trial, most do so. In addition, Ms. Rae Tramontano, the Republican

Registrar of Voters for New Haven, testified that her office prepares a preliminary version of the registration list in October and displays it in convenience stores, libraries, and any other public place that is willing to accept it. The publication of the eligible voter list enables members of the public to check their own entry on the list for accuracy, as well as to challenge the eligibility of any voter whose name appears on the list, either before election day or even at the polls. The list also allows candidates for office and political parties to focus their efforts to garner support on voters who, by registering, have indicated an intention to vote.

> D.      Civil and Criminal Penalties for Fraud

In addition to various strategies for verifying identification, Connecticut seeks to deter fraud with criminal penalties. Every voter registration form requires the voter to sign an affirmation that he or she is eligible to vote, and warns: "if you sign this statement even though you know it is untrue, you can be convicted and imprisoned for up to five years and fined up to $5,000." Fraudulent registration of oneself or others is punishable by imprisonment for up to one year and a fine of up to $500. *Id.* § 9-357. The same penalty plus disenfranchisement is applicable to someone who falsely votes under the name of another registered voter. *Id.* § 9-360. Voting for an election in which one is not qualified, or voting more than once in the same election, is punishable by disenfranchisement, imprisonment for one to two years, and a fine of $300-$500. *Id.* § 9-360. Anyone who falsely testifies before a registrar or election moderator to any material fact concerning the right of any person to be registered or to vote will be disenfranchised and may be imprisoned for up to two years. *Id.* § 9-358. And intentionally making a false written statement on the application for a presidential or an absentee ballot is a Class D felony, punishable by imprisonment for up to 5 years, and a fine up to $5000. *Id.* §§ 9-359a, 53a-35, 53a-41(4), 53a-156. Although Public Act 05-235, which became law in July 2005, made some changes to the

14

penalty provisions of the election law, it did not stiffen any of the penalties listed above. *See* 2005 Conn. Pub. Acts 674-75.

E.     *The Statewide Computer Database of Registered Voters*

HAVA required each state to implement, by January 2004, an "official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 42 U.S.C. § 15483(a)(1)(A). Further, the information in the system must be immediately accessible to every election official in the state, including local officials. Connecticut had a head start on this project, having contracted with IBM to build such a system as early as 1994, and was in full compliance with HAVA by January 2004, as of which date all 169 towns in Connecticut were connected to Connecticut's statewide Centralized Voter Registration System (CVR database).

The CVR database is a browser-based system that stores all the information gleaned from voter registration forms in a single statewide database, in contrast to the previous system under which registrars maintained independent hard-copy voter lists at the local level. The functions of the CVR database include adding and changing voter registrations, compiling statistics required by federal law, generating official voter lists, conducting an online inquiry of the statewide voter list, and communicating in real time with the database of the Department of Motor Vehicles to verify voters' driver's license numbers, or the last four digits of a voter's Social Security number. When a registrar enters a voter's registration information, the system checks for exact matches on last name and date of birth, and displays the full name, address, and date of birth of any matching voters, allowing registrars to ask registrants for clarification. However, the system does not provide real-time information on which voters have already cast ballots on election day, and even

15

registration information may not be perfectly up to date since registrars are not required to enter every registration into the system on the day it is received.

HAVA requires that the electronic registration system assign a unique identifier to each legally registered voter in the State. The CVR database actually assigns an identifier to each voter record, so the identifier cannot be used to identify duplicate registrations. Although driver's license numbers are entered into the system when available, they cannot be used to spot duplicates, because the system does not allow searches by driver's license number. In fact, out of respect for voters' rights, the system was designed not to reject apparently duplicative entries. However, Connecticut law authorizes the Secretary of the State to conduct periodic searches of the database to identify voters who are registered in more than one town. Conn. Gen. Stat. § 9-21a. The Secretary performs this task by means of a computer program that searches for matches on last name and date of birth, compiling a list of potential duplicates for further investigation by the registrars of affected towns. The record contains conflicting accounts of how often the Secretary compiles such a list, but the minimum estimate was once a year, in January or June – that is, not during the peak registration period before an election. Registrars receiving a list of potential duplicate registrations from the Secretary of the State are obliged to send a notice regarding the possible duplicate registration to each affected voter. The notice requires the voter to reassert her right to remain on the registered-voter list, or be removed from it. However, a voter may not be removed until the registrars of both towns implicated by a possible duplicate registration have conferred and agreed that the voter is registered in both places.

Terminals for accessing the CVR database are not installed at polling stations, so the system is only accessible to registrars and a few town clerks at the registrar of voters' offices. Furthermore, the reliability of the CVR system has been called into question as a result of

continuous crashes during the final, and very busy, two days of the registration period for the 2004 election, as well as during local elections held in May 2005. On these dates, many registrars were either unable to access the CVR system at all, or found the system unworkably slow. As a result, registrars could not run the usual checks to see whether registrants were already registered elsewhere in the State, and whether the driver's license and social security information matched that on file with the Department of Motor Vehicles; nor could they enter new registration information, creating a backlog of thousands of registration cards. In addition, Ms. Tramontano, the Republican Registrar of Voters for New Haven, testified that the CVR system often slows down at busy times, such as close to cutoff dates, when many towns are accessing the statewide system simultaneously. As a result of the CVR system's sluggishness, during periods of heavy registration traffic, it takes much longer to perform the standard checks to see whether an individual has registered elsewhere, with the result that each in-person registration may take up to fifteen minutes to perform.

The State and the private contractors responsible for maintaining the CVR database are aware of these performance issues and have been seeking to ameliorate them. The Secretary of the State has indicated that she believes that the problems have been resolved, but local officials remain concerned about the possibility of a recurrence or the development of new difficulties.

**Connecticut's Experience with Voting and Registration 1996-2004**

According to statistics for the year 2000, 75% of the voting-age population of Connecticut was registered to vote, compared with a national average of 76%. However, far fewer voters than are registered actually turn out to vote. Indeed, voter *turnout* in Connecticut has dropped from

76% of voting-age population in 1960, to 58.4% of voting-age population in 2000, with 2004 representing a ten-year high of 58.8% turnout.

According to Plaintiffs' expert, Professor Jonathan Nagler of New York University, Connecticut's experience of declining voter turnout parallels a national trend involving a steep decline between 1960 and the early 1970s that established a new, lower, average voter turnout, followed by two decades of fluctuation around that low average, and then an upward bump in the 2004 presidential election. Remarkably, the decline was not arrested nationally by the passage of the Voting Rights Act of 1965, or in Connecticut by the passage of legislation reducing the registration deadline from twenty-four days prior to 1977, to fourteen days between 1991 and 2005. Indeed, data compiled by the Federal Election Commission show that even the states that have introduced EDR have not escaped declining turnout. *See* Tables of Presidential Voter Registration and Participation Statistics *at* http://www.fec.gov/votregis/turn/turn.htm. It is therefore clear, as Professor Nagler agreed at trial, that something much more significant and fundamental than time-to-register has been influencing overall voter turnout, and that adopting EDR likely will only reduce the extent of the decline in voter turnout.

As mentioned above, Connecticut permits all unregistered voters to cast a ballot in the presidential races. In 1996, when a seven-day deadline for presidential ballots was in effect, only 1,000 citizens voted by presidential ballot. However, after the legislature made presidential ballots available on election day itself, there was a dramatic increase in the number of voters exercising the presidential ballot option – with more than 30,000 presidential ballots cast in both 2000 and 2004.

Testimony at trial indicated that registrars and town clerks in at least some towns encouraged presidential ballot voters to register at the polls by providing them with registration

cards when they cast their ballots. The success of this enterprise appears to have varied from one town to another. Mr. Abbate testified that in Cheshire almost all of the 188 individuals who voted by presidential ballot took advantage of the opportunity to fill out a registration card at the same time. Ms. Hutton, Town Clerk of Middletown, testified that of 530 individuals casting presidential ballots, perhaps 100 completed registration cards. Ms. Hutton speculated that the reason for this might be Middletown's large population of students who may know that they will never again vote in the town. Finally, Ms. Tramontano, Republican Registrar of Voters for New Haven, testified that of 1040 unregistered voters who cast presidential ballots, only 240 also took the time to register.

The large increase in voters applying for presidential ballots on Election Day 2000 caused long lines and considerable chaos at town clerks' offices with a shortage of ballots in some places, but the process ran much more smoothly in 2004.  The large volume of presidential ballots cast does not appear to have led to a concomitant increase in electoral fraud. Mr. Garfield of the Elections Commission testified that, after asking town clerks and registrars to look through their records for suspicious activity, the Commission received only one notice of possible fraud in connection with the more than 30,000 presidential ballots cast on Election Day 2000, and that complaint was not substantiated. In 2004, there were claims that up to 500 presidential ballots had been fraudulently cast, and the Elections Commission is still investigating those claims, though Mr. Garfield acknowledged on cross-examination that these cases may be attributable to previously unregistered voters both casting presidential ballots and registering to vote in future elections on the same day.

Indeed, Plaintiffs contend that electoral fraud in general is not a large problem under Connecticut's current regime and, happily for the voters of Connecticut, Plaintiffs' position was

largely supported by the testimony of the Defendant's witness, Elections Commission General Counsel Jeffrey Garfield. Mr. Garfield testified that, over the last five years, the State's Elections Commission has received approximately 1100 complaints of fraud, but only about five substantiated cases per year of voter and registration fraud combined. However, Mr. Garfield further testified that his extensive experience with Connecticut elections leads him to believe that more voter fraud occurs than is reported: "I think we have evidence that voter registration fraud is committed and as I indicated before, there's a lot more that we don't see because its difficult to detect and people don't tend to bring all the cases to us that exist out there."  Mr. Garfield's view was shared by long-time registrar Ms. Tramantano. The Court finds their testimony credible and accepts the judgment of these witnesses that more voter registration fraud occurs in the State than is ever actually reported or investigated.

**A Brief History of Election-Day Registration (EDR)**

On August 6, 1965, President Johnson signed into law the Voting Rights Act of 1965, which, among other important reforms, prohibited states from employing durational residency requirements to restrict access to the ballot in presidential races (but not in congressional or local races). *See* Voting Rights Act of 1965, 42 U.S.C. § 1973aa-1(b). The Voting Rights Act appears to have generated a wave of reform in state election laws during the 1970s. In the period between 1972 and 1974, Maine, Minnesota, and Wisconsin adopted EDR laws as part of a more general process of liberalizing the states' registration requirements. Then, in 1977, President Jimmy Carter proposed a federal law imposing on states EDR requirements similar to those previously adopted in Minnesota and Wisconsin. However, President Carter's proposed EDR legislation was rejected

by both houses of Congress, and between 1977 and 1993 no other state in the nation adopted EDR.

In 1993, President Clinton signed the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg, which requires, among other things, that states offer voter registration services at numerous state agencies, including those providing public assistance and unemployment compensation, as well as public schools and libraries. Notably, the NVRA did not make election-day registration compulsory for states, but instead provided an exemption from its requirements for those states that voluntarily adopt EDR. Three states – Idaho, New Hampshire, and Wyoming – took advantage of the exemption and passed laws implementing EDR. The Wyoming Secretary of State, who testified via deposition in this case, confirmed that EDR was adopted in Wyoming to avoid the costs of implementing the NVRA. Despite the carrot provided by the NVRA exemption, no other state has adopted EDR.

The NVRA-inspired adoption of election-day registration in Idaho, New Hampshire, and Wyoming raised the number of EDR states to six – Idaho, Maine, Minnesota, New Hampshire, Wisconsin, and Wyoming ("EDR states"). A number of other states have also considered EDR systems. In 2002, EDR ballot initiatives were defeated in Colorado and California. Oregon experimented with EDR in the 1970s and 1980s, repealed the system in 1985, and is now apparently considering it again. EDR proposals are also currently under consideration in Massachusetts, Montana, New York, North Carolina, and Vermont. In addition, at least four bills providing for national EDR are under consideration by the United States Congress: The Voting Opportunity and Technology Enhancement Act of 2005, S. 17, H.R. 533; The Count Every Vote Act of 2005, S. 450, H.R. 939; The Same Day Voter Registration Act of 2005, H.R. 496; The

21

Voter Outreach and Turnout Expansion Act of 2005, H.R. 3557.  To date, however, Congress has chosen not to require states to adopt EDR.

**The Evidence Favoring EDR**

Supporters of EDR urge its adoption with the purpose of increasing voter turnout, and Plaintiffs presented three highly qualified experts – Professors Donald Green of Yale Univeristy, Kenneth Goldstein of the University of Wisconsin, and Professor Jonathan Nagler of New York University – who testified to the potential of EDR in this regard. Professors Green and Goldstein explained Plaintiffs' view of the causal relationship between voter turnout and election-day registration. Professor Green testified that requiring registration in advance of elections for non-presidential races is problematic in his view because lower-profile races, and especially state and local races, tend to excite voter interest only very close to election day and usually after most registration deadlines have passed. He explained that most media coverage comes in the two weeks leading up to elections, just as voters themselves are becoming interested in the races, but that, by then, it is too late to register for most unregistered citizens who decide they want to vote. Campaigns for candidates for most offices also typically ramp up their efforts in the week or two before an election, and since that is after most pre-election-day registration deadlines have passed, campaigns tend to focus their efforts on registered voters. Campaign neglect of unregistered voters may also entrench non-voting because political scientists have found that voting is a habitual activity.

Professor Goldstein presented the results of various studies demonstrating that a high proportion of all campaign advertisements for, and local new stories about, federal races occur in the final week or two weeks before an election. According to Professor Goldstein, in 1998, 35%

of all advertisements for federal races occurred in the last two weeks before the election, and 19% occurred in the last week. The pattern for 2000 and 2002 was similar. Professor Goldstein also showed that of all the local news stories covering federal races during the last seven weeks of the campaign, 54% aired in the last two weeks and 36% aired in the last week. In sum, Professors Goldstein and Green explained that EDR encourages higher voter turnout because voters only become interested in political races close to election day, and campaign staff and media organizations respond to this late-blooming voter interest by concentrating the distribution of information about candidates in the last few weeks of the election cycle, thus reinforcing the last-minute interest.

The explanation of the likely quantitative impact of EDR on voter turnout fell to Professor Nagler. Plaintiffs' argument as to how much EDR might affect voter turnout in Connecticut began with the observation that EDR states have higher voter turnout on average than non-EDR states. In this connection, Professor Nagler cited data showing that in the 2000 presidential election, EDR states enjoyed an average turnout of 65.4% of voting-age population, compared with an average for non-EDR states of 50.5%, and a figure of 58.4% for Connecticut. Based on the experience of the EDR states, Professor Nagler predicted that EDR would increase turnout for presidential elections in Connecticut by 5.2%, which, in the year 2000, would have corresponded to an extra 130,000 voters.

However, Professor Nagler's supposition appears to the Court to have a number of flaws. As a preliminary matter, the Court notes that despite the superficial allure of statistics comparing EDR and non-EDR states, the extent to which EDR is the driver of higher turnout in EDR states is questionable. To begin with, at the time of adopting EDR, each of the EDR states already had higher turnout than the national average. *See* Tables of Presidential Voter Registration and

Participation Statistic *at* http://www.fec.gov/votregis/turn/turn.htm. Plaintiffs' expert from Wisconsin confirmed this fact. Thus, as commonsense would suggest, voting culture is an important factor affecting voter turnout. Moreover, focusing on the averages for EDR and non-EDR states masks a large spread in turnout between the EDR states, and the strong or even superior performance of certain non-EDR states. Thus, Professor Nagler's report also reveals that turnout in 2000 was only 54.5% in Idaho and 59.7% in Wyoming (both EDR states) compared with 67.3% in Maine and 68.8% in Minnesota (both non-EDR states). Further, Alaska, a non-EDR state, had higher voter turnout than the average EDR state; five non-EDR states (Alaska, Iowa, Montana, Oregon, and Vermont) had higher turnouts than two of the EDR states (Idaho and Wyoming); and fifteen non-EDR states had higher turnouts than Idaho, an EDR state. Similarly, in 1998, New Hampshire had a turnout of only 35.4%, while 60% of Minnesota's citizens came to the polls, and Alaska and Nebraska had higher turnouts than any of the EDR states except Minnesota. In short, as is often the case with statistics, each side of the EDR debate can find some figures to support their position.

Furthermore, Professor Nagler acknowledged that his 5.2% figure for the magnitude of the impact of adopting EDR in Connecticut might be a significant overestimate for a couple of reasons. First, Professor Nagler conceded his model did not take into account the number of Connecticut citizens already voting by presidential ballot, and that if his model did so, EDR might be expected to boost turnout by only 4.2%. Second, and more seriously, Professor Nagler admitted that his model assumes that Connecticut would implement what is known as one-step EDR. The one-step EDR approach allows voters to register and vote in the same location, usually a polling place, and is employed in five of the six EDR states (Wisconsin, Wyoming, Minnesota, New Hampshire, and Idaho). Maine, however, employs a two-step approach, requiring election-

day registrants to register at the office of the registrar, and then travel to a polling place to cast their ballots. This difference in approach is significant because, to date, the majority of proposals for EDR in Connecticut have involved a two-step process like Maine's, and Plaintiffs have not argued that a two-step EDR process would run afoul of the Constitution. Professor Nagler was unable to predict with confidence the likely impact of a two-step process like that contemplated by Connecticut, but he observed that Oregon had once experimented with such a system, and had experienced only a one or two percent increase in voter turnout. Notably, Oregon has since abandoned its EDR system and now requires pre-election-day registration.

In assessing all three experts' testimony as to the likely impact of EDR on voter turnout in Connecticut, the Court must take account of one final factor: the decision of the Connecticut legislature in July of this year to reduce its registration cutoff from fourteen to seven days. As noted above, when trial commenced in this case, the deadline for registration was still fourteen days before a general election, and each of the experts based his analysis around that figure. The Court is certain that Plaintiffs are correct that many voters only really begin to pay attention to election campaigns at the last minute. Such is human nature. However, the Court is bound to note that the reports of Professors Goldstein and Green indicate that under a seven-day deadline, voters will have had at least one week of fairly decent media coverage of an election before registration closes, and that Professor Nagler acknowledged that the length of the cutoff period makes a "big difference, [it's] a key thing that is a component of the model," and that reducing registration from fourteen to seven days would also increase turnout. Thus, like the implementation of the presidential ballot, Connecticut's reduction of its registration cutoff will to some extent erode the proportional increase in voter turnout to be gained by implementing EDR.  In addition, the Court notes that Plaintiffs' experts conceded that their conclusions were applicable to voters in general,

and were not based on studies devoted to the class of voters at issue in this case – namely, unregistered voters – and that neither they nor anyone else knows much if anything about the habits or motivations of unregistered voters.

Although the Plaintiffs' expert evidence is susceptible to criticism on the grounds sketched above, on balance the Court agrees with Plaintiffs that it is likely that adopting EDR would have a positive effect on voter turnout in Connecticut. However, on the record before it, the Court believes that the impact on voter turnout would be more modest than Plaintiffs assert – closer to one percent than five percent. That said, as the Court explains below, whether the likely impact is one or five percent is not determinative in this case, since Connecticut's registration deadline would survive constitutional challenge even if EDR increased voter turnout by five percent.

**The Evidence Against EDR**

Opponents of EDR raise concerns about administrative burdens, election-day confusion, and the potential for fraud. The evidence presented in this case indicates that the volume of voters who take advantage of same-day registration in EDR states is very large, and much larger than the number of voters that Plaintiffs assert will only vote if they can register on election day. According to Professor Nagler, for the 2004 election, Minnesota reported that 21% of those voting, or 590,467 people, registered on Election Day; in Idaho the proportion was 19%, or 117,622 individuals; in Wyoming it was approximately 16%; and in Wisconsin the proportion was 14.7%. These figures would seem to support the concern expressed by, for example, Mr. Abbate (the President of the Registrars' Association) that a side-effect of EDR may be to encourage people who would otherwise register in advance of election day to wait and sign up at the polls. To put this concern in perspective, if Connecticut had adopted EDR in 2004 and had

experienced a volume of election-day registration similar to Wisconsin, Wyoming, Idaho, and Minnesota, poll workers in Connecticut's towns would have confronted over 200,000 individuals lining up to register at the polls, *even if EDR led to no increase in voter turnout*.[4] Chaos reigned in Connecticut in 2000 when only 30,000 unregistered voters showed up to cast presidential ballots, and, although the process ran more smoothly in 2004, two of the three registrars of voters who testified asserted that they likely could not cope with the kind of volume of election-day registrants experienced by EDR states.

As to the impact of EDR on fraud, the record before the Court is rather thin. Plaintiffs submitted various reports by public interest groups that baldly assert that there is no evidence of an increase in voter fraud in EDR states. The paucity of formal findings of fraud in EDR states was reiterated by the first of three fact witnesses presented by Plaintiffs, Professor Lorraine Minnite, who based her views on a compendium of articles and news reports concerning election fraud that she had culled from a selection of electronic databases.[5]  In a similar vein was a report by the Connecticut Office of Legislative Research ("OLR Fraud Report") that was "based on calls

---

[4] According to Professor Nagler, turnout in Connecticut in 2004 was 58.8% of the voting-age population. The website from which he derived his figures gives Connecticut's voting-age population as 2,669,903, which means that 1,569,902 people voted in 2004. *See* Pls.' Ex. 131 at 2, Addendum to Expert Report of Jonathan Nagler, citing United States Election Project, http://elections.gmu.edu/Voter_Turnout_2000.htm. Election-day registration by 15% of those individuals corresponds to 235,485 election-day registrants.

[5] Professor Minnite was originally offered as an expert witness, but she was withdrawn as an expert after Defendant challenged her expertise on the topic for which she was proffered.  In essence, the basis for the opinion that Professor Minnite had intended to offer at trial was a compendium of articles and news reports concerning election fraud that she pulled from a selection of electronic databases. Defendant continues to object to Professor Minnite's compendium of news stories as well as her testimony as improper lay opinion. Although the Court will not exclude Professor Minnite's fact testimony and exhibits, it notes that their value, if any, is extremely limited since the existence or non-existence of published articles respecting voter fraud does not constitute actual evidence as to the prevalence of voter fraud, and in any event, as noted below, states need not wait for an outbreak of voter fraud in order to take measures to try to prevent it from occurring in the first place, *see infra* Section II.B.2.

to the office of the chief election official [or Attorney General] in each [EDR] state," and that summarized its findings as follows: "While no state had any formal allegation of fraud, four had anecdotal information peculiar to each state." Pls.' Ex. 125 at 1. However, the OLR Fraud Report in fact provided anecdotal information for only three states, and that information was extremely vague – New Hampshire "has had some complaints;" Wyoming reported "alleg[ations] that out-of-state residents are crossing state lines and voting in Wyoming [but] this has not been substantiated"; and Wisconsin's "elections director has heard of some isolated cases where college students have been placed on deferred prosecution for [voter fraud]." *Id.* at 2.   Joe Meyer, Secretary of State for Wyoming, testified by deposition, but his testimony essentially amounted to an assertion that his thirty-five years of experience as a state official causes him to believe that there is very little voter fraud in his state, and that when fraud does occur, it is adequately detected and reported. However, even Mr. Meyer qualified his testimony by an admission that he may not be aware of every case of voter fraud that arises.

The only really significant information in the record as to the prevalence of fraud in EDR states is restricted to the situation in a single EDR state – Wisconsin. That evidence tends to indicate that the jury is still out on the relationship between EDR and fraud. Mr. Kevin Kennedy, Executive Director of the Wisconsin State Elections Board, testified that in his twenty-six years of service he has never had the sense that voter fraud was a problem in Wisconsin, and indeed has heard about less than ten convictions or prosecutions for election-day registration fraud. He further testified that he believes the face-to-face nature of election-day registration actually decreases fraud compared to mail-in registration. However, Mr. Kennedy acknowledged that in Wisconsin, as elsewhere, voter fraud may go undetected, and that Wisconsin had experienced significant problems in the 2004 election, including the failure to process around 20,000 of the

28

registration cards submitted more than thirteen days prior to the election, and a discrepancy of as many as 7,000 votes between the number of people recorded as voting and the number of votes cast.

Mr. Kennedy offered his personal view that the most likely explanation for the problems in 2004 was administrative error – namely, the failure of poll workers properly to maintain the records on election day. However, Defendant provided the Court with the preliminary report of a joint task force of the Milwaukee Police Department, District Attorney, United States Attorney and the Federal Bureau of Investigation, set up to investigate Wisconsin's problems in the 2004 election. The Task Force's investigation focused on some 70,000 election-day registrations and concluded that a large majority of the reported errors were due to poor data entry, supporting Mr. Kennedy's sense that the real challenge with EDR is proper administration, not necessarily voter fraud.  Nonetheless, the Task Force also found evidence sufficient to suggest that there had been more than 100 instances of voter fraud, not including 200 cases of voting by ineligible felons. There has been no final conclusion of the Wisconsin investigation.

In the Court's view, the evidence in the record as to the EDR states' experience of with voter fraud illustrates that although elections in the United States are far from riven by fraud, the potential for voter fraud exists, and states are, therefore, right to be concerned about it and to take steps to minimize it.

**EDR in Connecticut**

Legislation to implement election-day registration has been introduced in the Connecticut legislature every year since 2001, with proposals varying mostly along the dimension of fraud protection. The 2001 bill, sHB 6823, would have introduced a two-step election-day registration

system: first, an unregistered voter desiring to vote on election day would visit her town registrar's office, where she would present a birth certificate, driver's license, or Social Security card, take an oath that she had not already voted in the election, and receive a notice of acceptance; second, the voter would then proceed to a polling place, where she would present the notice of acceptance and cast her ballots. *See* Pls.' Ex. 62, Office of Legislative Research, Bill Analysis, File No. 488 at 10. The 2002 bill, sHB 5700, would have introduced a two-step process similar to that suggested by the 2001 bill, but with the additional requirements that voters supply proof of address, and that registrars send out a confirmation notice, which, if returned undeliverable, would result in the name of the voter being passed on to the Elections Commission for investigation of possible voter fraud. *See* Pls.' Ex. 64, Office of Legislative Research, Bill Analysis sHB5700. Defendant, Secretary of the State Susan Bysiewicz, supported the 2002 bill and testified to her sense that EDR "would go a long way toward encouraging young people . . . to participate in [the] election process," Pls.' Ex. 10, *Hearing of the Government Administrations and Elections Committee* (March 11, 2002) at 8, and that "for the future . . . we can eliminate presidential ballots and move toward a system where we can have protections in place to protect the integrity of the process and at the same time allow people to register to vote on election day," Pls.' Ex. 36, *Hearing of the Government Administrations and Elections Committee* (February 20, 2002) at 22-23.

With bi-partisan support, the Connecticut legislature in 2003 passed a two-step EDR proposal, sHB6370, Public Act 03-204, which would have allowed a citizen resident in Connecticut to register to vote and cast a ballot on election day if she presented identification displaying her name, address and photograph (or, if no photographic identification was available, submitted to having a picture taken by the registrar), and signed under penalty of perjury a

statement affirming her eligibility, the fact that she had not already registered or voted elsewhere, and her understanding of the criminal penalties for making a false statement. As under the 2002 proposal, registrars would send out a confirmation notice, which, if returned undeliverable, would result in the name of the voter being passed on to the Elections Commission for investigation of possible voter fraud. *See* Pls.' Ex. 66, Public Act 03-204 §§ 2(2)(A)(6).

The 2003 EDR Act was supported by Secretary Bysiewicz, Attorney General Richard Blumenthal, the Elections Commission, and the Registrars' Association, all of whom were satisfied with the Act's strong identification provisions. However, the Act was vetoed by then-Governor John Rowland because at that time the State's CVR database had not yet been fully implemented, and he was concerned about the potential for voting fraud in the absence of "an accurate, complete, up-to-date and real-time centralized voter registration database." Pls.' Ex. 69, Letter from Governor Rowland to Secretary Bysiewicz regarding sHB6370 (July 9, 2003). Though it was the legislature's prerogative to do so, the General Assembly did not override the Governor's veto.

In December 2004, during a hearing of the Government Administrations and Elections Committee convened to discuss the November 2004 election, Secretary Bysiewicz (who chose not to testify in this case) testified that all towns were now connected to a centralized voter registration database, so that the former "governor's stated concern about possible fraud . . . [was] taken care of." Pls.' Ex. 1, *Hearing of the Government Administrations and Elections Committee* (Dec. 8, 2004) at 35.  Secretary Bysiewicz also testified that she "remain[s] a very strong proponent of Election-day registration and hope[s] that this concept will be implemented." *Id.* at 4. Three more EDR bills were introduced early in the 2005 legislative session. On March 13, 2005, one of the three EDR bills passed the Government Administrations and Elections

Committee with overwhelming bi-partisan support. This bill would have permitted citizens resident in Connecticut to register and cast a *conditional* ballot on election day, subject to an oath of eligibility and presentation of identification showing the applicant's name and residence, but not necessarily a photograph. The conditional ballot would be counted only if the registrar were able to confirm the voter's eligibility by post-election investigation. Stip. ¶¶ 194-205. However, this EDR proposal ultimately died in the last session of the General Assembly, and Public Act 05-235, passed in July, does not contain any EDR provisions.

Although both the Registrars' Association and the Elections Commission had supported and even helped to craft the 2003 EDR Act, and although the security provisions of Proposed Substitute Bill 6669 are very similar to those of the 2003 Act, representatives of both organizations testified at trial that their organizations did not support EDR in 2005. A key reason for this change of heart was their experience with the CVR system. As these witnesses explained, their prior support of EDR had been contingent on the existence of a reliable statewide electronic database of registered voters, but that confidence in the technological feasibility of EDR had been shaken by occasional but serious negative experiences with Connecticut's CVR system.

On behalf of the Registrars' Association, Mr. Abbate also testified to a concern that EDR might create a disincentive to registration during the year, and thus create a dramatic increase in the number of unregistered voters wishing to cast a ballot on election day. Plaintiffs argued that approximately 3-5% of the population become interested in an election only as the media coverage increases in the final two weeks, after the registration deadline has already passed. According to Plaintiffs, EDR would allow this 3-5% of the population to vote along with those who take an earlier interest in political events. Mr. Abbate testified that a small increase in same-day registrants might be manageable but, although Wisconsin has seen the predicted 3-5%

increase in voter turnout since introducing EDR, the number of individuals registering on election day has not been confined to the previously non-voting 3-5%, but has ballooned to 15% or more of all those who turn out to vote. As recounted above, similarly high volumes are reported in some of the other EDR states. According to Mr. Abbate, the volume of election-day registration experienced by the EDR states would be unworkable in Connecticut.

## II.

Having recited the facts presented at trial, the Court now turns to the legal claims of the parties. Plaintiffs have asserted that Connecticut's pre-election-day registration requirement violates their rights under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs do not claim that it is unconstitutional to register voters; they claim only that it is unconstitutional to make them register at any time before election day. Furthermore, at trial and at oral argument, Plaintiffs expressly disavowed any claim in this action that the State's registration requirements are unconstitutional because they invidiously discriminate against any group.

Plaintiffs bring their claim of unconstitutionality under both the First Amendment – incorporated against the states through the Due Process Clause of the Fourteenth Amendment – and the Equal Protection Clause of the Fourteenth Amendment. In the context of challenges to election regulations, the Supreme Court has acknowledged that claims under the due process and equal protection doctrines, as well as analysis of those claims, often merge. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 787 n.7 (1983) ("In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause."). Thus, as the Second Circuit has explained, the inquiry for this Court under either doctrine is essentially the same: "In due process cases . . . and in equal protection

33

cases . . . the Supreme Court has consistently held that . . . not all restrictions on access to the ballot merit strict scrutiny. . . . The critical question is the extent to which a challenged regulation burdens First and Fourteenth Amendment [voting] rights." *Rockefeller v. Powers*, 74 F.3d 1367, 1377-78 n.16 (2d Cir. 1995) (internal citations and quotation marks omitted). Therefore, the Court analyzes under both the Due Process and Equal Protection Clauses Plaintiffs' arguments that Connecticut's registration requirement unconstitutionally burdens their rights to vote, associate, and engage in political speech.

Before getting to those arguments, however, the Court notes that Plaintiffs' brief also suggests a more traditional equal protection argument – namely, that Connecticut's law violates the Equal Protection Clause because it permits unregistered voters to cast ballots for President and Vice-President, but not for non-presidential offices. This equal protection argument is fundamentally flawed, and the Court will dispose of it now so as not to clutter the later analysis. As a preliminary matter, the Court notes that the distinction between presidential and non-presidential races is derived from a provision of the Voting Rights Act of 1965, 42 U.S.C. § 1973aa-1 ("VRA"), which requires states to allow individuals who become resident after the deadline for registration has passed to cast a ballot for President and Vice-President. *See id.* § (e) ("If any [otherwise eligible] citizen of the United States . . . has begun residence in [a] State . . . after the thirtieth day next preceding [a presidential] election and, for that reason, does not satisfy the registration requirements . . . he shall be allowed to vote . . . for President and Vice President."). The Court also notes that, consistent with the VRA, the fifty-day registration deadline upheld by the Supreme Court in *Burns v. Fortson*, 410 U.S. 686 (1973), contained an exception for those voting for presidential offices but not other offices, and no party or Justice suggested that the distinction made in the law between presidential and non-presidential races was

in any way problematic. Unsurprisingly, therefore, Plaintiffs have said that they do not challenge the VRA as unconstitutional.

More fatal to Plaintiffs' traditional equal protection claim is that they simply cannot make the required showing that the registration regulation treats similarly situated *voters* differently. *See, e.g.*, *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated."). Plaintiffs do not dispute that the State is justified in distinguishing between registered and unregistered voters, and that the State treats all unregistered voters the same – they are all permitted to vote for presidential offices but no others. Plaintiffs' reliance on *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979), is misplaced, because the Court's finding of an equal protection violation in that case turned on the disparate treatment of similarly situated *candidates*, not voters. The Court notes that at oral argument Plaintiffs rightly conceded the weakness of their equal protection arguments focused on presidential ballots, and appeared ready to rest on the claims analyzed later in this opinion. Accordingly, the analysis that follows will be devoted to Plaintiffs' arguments that the registration requirement unconstitutionally burdens their rights to vote, associate, and engage in political speech under both the Due Process Clause (incorporating the First Amendment) and the Equal Protection Clause.

## A.

As stated above, the question of the constitutional limits that apply to voter registration deadlines is not one of first impression for the federal courts. Indeed, the Supreme Court has provided binding precedent directly on point. For example, over thirty years ago in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court struck down Tennessee's durational residence

requirement, according to which a would-be voter had to have been resident in the state for a year and in the county for three months before she could vote. While the Supreme Court invalidated Tennessee's residence requirement as unconstitutional because of its length, the Court wrote approvingly about another provision of Tennessee's law that required all voters to register to vote thirty days in advance of an election. According to the Supreme Court, the State's legitimate concern with voter fraud could be addressed by its pre-election-day registration requirement. While expressly declining to announce a bright line rule, observing that "[f]ixing a constitutionally acceptable period is surely a matter of degree," *id.* at 348, the Supreme Court nonetheless stated that "30 days appears to be an ample period of time for the State to complete whatever administrative tasks are necessary to prevent fraud – and a year, or three months, too much," *id*. Therefore, the Supreme Court in *Dunn* appeared to endorse Tennessee's thirty-day registration cutoff as constitutionally permissible.

Of course, the *Dunn* Court did not directly confront the constitutionality of Tennessee's registration period, so one might characterize its statements regarding a thirty-day registration period as *dicta*. However, that precise issue was raised by two decisions in the following year, and in both of those decisions the Supreme Court upheld voter registration deadlines of fifty days prior to a general election. In *Burns v. Fortson*, 410 U.S. 686 (1973), the Supreme Court upheld Georgia's fifty-day voter registration deadline on the basis of the State's interest in promoting "the orderly, accurate, and efficient administration of state and local elections, free from fraud." *Id.* at 686-87. Not even the three dissenters in *Burns* suggested that pre-election-day registration was *per se* unconstitutional – their objection to Georgia's law was not that it required registration before the election but that its fifty-day deadline exceeded the thirty days that *Dunn* had

considered sufficient. *See id*. at 689 ("If 30 days were all that some state officials needed yesterday, that is all they need today.") (Marshall, J., dissenting).

In *Marston v. Lewis*, 410 U.S. 679 (1973), the Supreme Court also endorsed Arizona's fifty-day registration cutoff, stating that "States have valid and sufficient interests in providing for some period of time – prior to an election – in order to prepare adequate voter records and protect . . . electoral processes from possible frauds." *Id*. at 680.  *Marston* also echoed *Dunn* in rejecting a rigid constitutional rule on the acceptable length of a registration period: "In the present case, we are confronted with a recent and amply justifiable legislative judgment that 50 days . . . is necessary to promote the State's important interest in accurate voter lists. *The Constitution is not so rigid that that determination and others like it may not stand*." *Id*. at 681 (emphasis added).

Both *Burns* and *Marston* are still good law.  Indeed, in 1999 Justice Ginsburg noted that Justice O'Connor had "correctly observe[d] that [voter] registration requirements for . . . election voters . . are 'classic' examples of permissible regulation."  *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 196 n.17 (1999). Like *Dunn*, *Burns* and *Marston* eschewed bright-line limits on what is constitutionally required of states with respect to pre-election-day registration deadlines for general elections and, while both decisions made it clear that fifty days "approaches the outer constitutional limits in this area," *Burns,* 410 U.S. at 687, it is apparent that far more onerous registration requirements than Connecticut's seven-day registration cutoff are constitutional. In other words, if, as in *Burns* and *Marston*, a state can justify a fifty-day pre-election-day registration deadline on the basis of administrative burden, then it follows that Connecticut's seven-day deadline is surely justified and constitutional in light of the State's interest in preventing fraud and election-day chaos.

Therefore, fidelity to the Supreme Court's clear holdings in *Burns* and *Marston* would require upholding Connecticut's pre-election-day registration requirement against Plaintiffs' constitutional challenge. Nonetheless, and despite *Marston*'s explicit statement that "a person does not have a federal constitutional right to walk up to a voting place on Election Day and demand a ballot," *Marston*, 410 U.S. at 680, Plaintiffs insist that election-day registration is constitutionally required. The Court disagrees.

## B.

Plaintiffs seek to evade the clear holdings of *Burns* and *Marston* by arguing that those decisions mandate strict scrutiny for the legislature's justification for state restrictions on voting, and that while Georgia and Arizona presented evidence in *Burns* and *Marston* sufficient to satisfy such exacting scrutiny, Connecticut has not done so in this case. Whatever the merits of Plaintiffs' characterization of the level of scrutiny employed in *Burns* and *Marston*, in recent years "the Supreme Court has consistently held that, even though 'election laws will invariably impose some burden upon individual voters,' not all restrictions . . . merit strict scrutiny." *Rockefeller*, 74 F.3d at 1377 n. 16 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).[6]

Because every election law "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends," *Burdick*, 504 U.S. at 433 (internal quotation marks omitted), "subject[ing] every

---

[6] The Court acknowledges that the Second Circuit in 1985 included *Dunn* and *Marston* in a string citation in support of the proposition that there had been "numerous decisions of the Supreme Court subjecting to strict scrutiny state laws denying various classes of individuals the right to vote." *Auerbach v. Rettaliata*, 765 F.2d 350, 355 (2d Cir. 1985). *Auerbach*, however, was decided seven years before the Supreme Court's synthesized its previous holdings into the sliding scale framework for review of election challenges enunciated in *Burdick*, 504 U.S. at 434, a development recognized by the Second Circuit in *Schulz v. Williams*, 44 F.3d 48, 58 (1994), and binding upon this Court.

voting regulation to strict scrutiny and [requiring] that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently," *id*. "Instead, [the Supreme Court] has held that 'the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.' " *Green Party of N.Y. State v. N.Y. State Board of Elections*, 389 F.3d 411, 419 (2d Cir. 2004) (quoting *Burdick*, 504 U.S. at 434).

Thus, the threshold question for this Court is whether Connecticut's seven-day registration deadline constitutes a severe burden on Plaintiffs' First and Fourteenth Amendment rights. Then and only then would strict scrutiny apply.[7]  In that instance, the Court would have to determine, in the rubric of strict scrutiny, whether the interests advanced by the State are compelling, and whether the seven-day deadline is narrowly tailored to protect those interests. On the other hand, if the burden of the registration deadline is not severe and it imposes only reasonable, non-discriminatory restrictions, the Court need only ask whether the State has advanced an important regulatory justification for its registration deadline. *See Green Party*, 389 F.3d at 419 ("If those rights are subject to severe restriction, the regulation has to be narrowly drawn to advance a compelling state interest. If it imposes only 'reasonable, nondiscriminatory restrictions,' then important regulatory interests are sufficient to justify the restrictions.") (quoting *Burdick*, 504 U.S. at 434); *accord Wit v. Berman*, 306 F.3d 1256, 1259-60 (2d Cir. 2002); *Lerman v. Pataki*, 232 F.3d 135, 145 (2d Cir. 2000).

---

[7] The Court notes once again that Plaintiffs have expressly disavowed any claim that the registration deadline invidiously discriminates against any group, so that route to strict scrutiny need not be considered.

**1.   Does Connecticut's Seven-Day Registration Deadline Severely Burden Plaintiffs' First and Fourteenth Amendment Rights?**

Plaintiffs' have asserted that EDR is constitutionally required no matter how easy Connecticut makes it to register prior to election day. That is, in Plaintiffs' view, any requirement of registration in advance of election day constitutes a *per se* severe burden, and as such must be subjected to strict scrutiny, no matter how easy it is to register. Plaintiff's position is simply untenable under current Supreme Court doctrine.

The Supreme Court long ago made clear that registration deadlines do not constitute *per se* severe burdens requiring strict scrutiny, but must be evaluated individually to determine "whether the time limitation imposed . . . is so severe as itself to constitute an unconstitutionally onerous burden." *Rosario*, 410 U.S. at 760. In *Rosario*, the Supreme Court considered the constitutionality of New York's eight-month registration cutoff for individuals wishing to vote in a primary election. Although *Rosario* was a primary election case, it is relevant to the consideration of deadlines for general elections, because the *Rosario* Court analyzed the primary registration deadline before it by contrasting it with the durational registration requirements for participation in *general* elections struck down in *Dunn*.

In its analysis, the Supreme Court in *Rosario* explicitly distinguished between regulations (such the durational residence requirements at issue in *Dunn*) that totally deny the franchise to a group of voters because "there [is] no way in which the members of that class could [make] themselves eligible to vote," *id.* at 757, and regulations (such as voter registration before an election) that "merely impose[] a time deadline on [voters'] enrollment, which they ha[ve] to meet in order to participate," *id.* The Supreme Court went on to subject the latter kind of regulation to only rational basis review, upholding New York's primary registration deadline because it was

40

"not an arbitrary time limit unconnected to any important state goal," *id.* at 760, but rather a regulation adopted in the service of "preservation of the integrity of the electoral process . . . a legitimate and valid state goal," *id.* at 761. Furthermore, both the majority and dissent in *Rosario* united in declaring in very broad terms that "the State is justified in imposing a reasonable registration cutoff prior to any primary *or general election*, beyond which a citizen's failure to register may be presumed a negligent or wilful act forfeiting his right to vote in a particular election." *Id.* at 765 (Powell, J., dissenting) (emphasis added) (cited in the majority opinion at 760); *see also Storer v. Brown*, 415 U.S. 724, 730-31 (1974) ("[T]he State's interest [is] obviously sufficient to limit voting to residents, to require registration for voting, *and to close the registration books at some point prior to the election, a deadline which every resident must meet if he is to cast his vote at the polls*.") (emphasis added).

The Supreme Court has continued to cite *Rosario* with approval. In fact, just last Term, the Court reiterated the point it had made twenty-two years previously in *Rosario*.  In discussing what burdens on voters are properly characterized as "severe," the Court noted that in Oklahoma's primary system, voters must register to participate in the primary. Distinguishing *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986), the Court observed that:

> *Tashjian* did not characterize this burden alone as severe, and with good reason. Many electoral regulations, *including voter registration generally*, require that voters take some action to participate in the primary process.  *See, e.g.*, *Rosario v. Rockefeller*, 410 U.S. 752, 760-62 (1973) (upholding requirement that voters change party registration 11 months in advance of the primary election).

*Clingman v. Beaver*, 125 S.Ct. 2029, 2038-39 (2005) (emphasis added). As *Clingman* went on to explain:

> Election laws invariably affect – at least to some degree – the individual's right to vote and his right to associate with others for political ends. *These minor barriers between voters and party do not compel strict scrutiny*. To deem ordinary

41

and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes. The Constitution does not require that result . . .

*Id.* (internal quotations and citations omitted) (emphasis added).

Faced with this insurmountable language from the Supreme Court holding that pre-election registration deadlines do not constitute *per se* severe burdens on the right to vote, Plaintiffs argue in the alternative that the strict scrutiny standard should automatically apply because Connecticut's registration deadline burdens core political speech. As the Second Circuit has explained, "restrictions on core political speech so plainly impose a severe burden that application of strict scrutiny clearly will be necessary." *Lerman*, 232 F.3d at 146 (internal quotation marks omitted). Plaintiffs do not argue that Connecticut's registration deadline prevents or even "significantly inhibit[s] communication with voters." *Buckley*, 525 U.S. at 192. All Plaintiffs argue is that it renders the final week of communication between unregistered voters and political campaigns politically ineffective.

However, the cases cited by Plaintiffs do not stand for the proposition that a reduction in the effectiveness of political speech constitutes a severe burden on that speech. Rather, in *Buckley*, conditioning qualification to circulate petitions on registration to vote reduced the number of individuals who could convey a political message to their fellow citizens, and particularly burdened would-be circulators for whom the "choice not to register implicate[d] political thought and expression." *Buckley*, 525 U.S. at 195. And in *Lerman*, the residence requirement for individuals wishing to witness ballot access petitions prevented would-be witnesses from "engag[ing] in interactive political speech and expressive political association across electoral district boundaries." *Lerman*, 232 F.3d at 142. Whether or not Connecticut's registration deadline reduces the impact of political speech in the last week of the campaign, the

42

evidence in this case is clear that it does not prevent or hinder the occurrence of that speech. Therefore, Connecticut's registration deadline cannot be said to impose a *per se* severe burden on core political speech.

Because *Rosario* makes clear that registration deadlines in general – whether for primary or general elections – are not *per se* severe burdens on First and Fourteenth Amendment rights, and because Connecticut's registration deadline does not hinder core political speech, the applicability of a strict scrutiny standard turns on whether the evidence in this case demonstrates that Connecticut's seven-day registration deadline severely burdens the right to vote and associate politically. In evaluating the burden imposed by a challenged election regulation, the Second Circuit has directed district courts to "proceed by the totality approach and consider the alleged burden imposed . . . in light of the state's overall election scheme." *Schulz v. Williams*, 44 F.3d 48, 56 (1994) (internal quotation marks omitted). The Court must also consider the fate of similarly situated parties under the regulation, and legal precedent on comparable regulations. *Id.* Following the Second Circuit's approach, the Court concludes that Connecticut's seven-day registration deadline (the most lenient pre-election registration requirement in the nation) does not constitute a severe burden on First and Fourteenth Amendment rights.

The record in this case shows that 2.1 million voters had managed to register to vote in Connecticut by December 2004. To put these numbers in perspective, the figures for the year 2000 indicate that approximately 75% of the voting-age population in Connecticut was registered to vote, compared with a national average of 77.7%. The high percentage of citizens who succeed in registering is unsurprising because the registration process in Connecticut is short and simple, and because the State makes significant public outreach efforts. Registration cards and information are available in Spanish and English at state libraries, schools, and the offices of the

43

Department of Motor Vehicles, the Department of Social Services, and the Labor Department, and can also be printed from the internet or requested by a telephone call to a registrar's office. In advance of the 2004 election, the Secretary of the State provided $100,000 to fund public service announcements regarding registration requirements and deadlines, and she arranged for over 500,000 registration applications to be inserted into copies of local newspapers over the Columbus Day weekend. Furthermore, Connecticut registration cards clearly indicate the deadlines for application, and provide a toll-free number for voters to call if they have questions. *See* Def's Ex. 513. Registration cards may be returned in person to any of the agencies listed above, or may be submitted by mail, and are pre-printed with a partial return address, so that postal applicants need only fill in the name of their town, rather than looking up the address of the registrar's office. In addition, numerous private groups, including many of the organizational Plaintiffs in this case, distribute and collect registration materials through voter registration drives.  Not only are the materials easy to obtain and submit, but the President of the Registrars' Association testified at trial that it generally takes less than a minute for individuals registering in person to complete the card.

Nonetheless, Plaintiffs point out that 25% of the voting-age population is unregistered, and that 30,000 unregistered citizens were sufficiently interested in voting to go to the polls on election day to cast presidential ballots, although they were foreclosed from voting for non-presidential offices. Plaintiffs presented two concrete examples of voters who would have liked to vote in all races, but were unable to register in time to do so. Garvin Roos, an impressive and articulate veteran currently enrolled in college, testified that his onerous work and study schedule, combined with a misunderstanding about where to register, prevented him from registering prior to election day in 2004. Mr. Roos testified that he was unable to mail his application because of

uncertainty about which address to give and where to vote, and that because of his work and school commitments, he was unable to make the time to travel forty-five minutes in each direction to what he believed was an appropriate registrar's office in order to clarify these matters. Nevertheless, Mr. Roos acknowledged that he had not attempted to resolve his questions by calling the Secretary of the State's toll-free inquiry line, and that he might have been able to make the journey to the registrar's office in less than two hours round-trip. Thus, the Court notes, registering to vote in 2004 would have consumed less time from Mr. Roos' busy schedule than his participation in this lawsuit has entailed.

Ms. Sorensen, a 43-year old Connecticut resident, has voted in every election but one since she became eligible to vote. Highly motivated to vote and familiar with the process of registration from past experience, Ms. Sorensen knew that she needed to register again when she moved from Stamford to Darien in March 2004, and that she would only have to complete an admittedly simple form to accomplish that goal. Having heard somewhere that she could register electronically, Ms. Sorensen went online and electronically completed  what she believed was the appropriate form to indicate her change of residence. Although Connecticut does not in fact have online voter registration, Ms. Sorensen thought that she had received a confirmation and was properly registered in her new location. However, on Election Day 2004, after waiting in line to vote in Darien, she was told that she was not registered there, and would only be able to cast a vote in Darien for President and Vice-President through the presidential ballot. Rather than accept this restriction, Ms. Sorensen traveled back to Stamford to see if she was still registered there but, after considerable time and effort, she discovered that she was not. Ms. Sorensen then cast a vote by presidential ballot, but she was unable to vote in any other race, including a congressional race in which she particularly wanted to vote. Both Ms. Sorensen and Mr. Roos further testified that

Connecticut's voter registration card does not mention, and they did not know about, the various exceptions to the registration deadline, and the various agencies authorized to provide and accept registration cards.

Of course, the examples of Ms. Sorensen and Mr. Roos do not tell us why the other 30,000 individuals who voted by presidential ballot in 2004 did not register. It may be that some of them, like Mr. Roos, were too busy, or thought that their question was too complex for a telephone inquiry, and that others, like Ms. Sorensen, mistakenly believed that they had registered when they had not. Others may have missed the deadline through inattention or miscalculation, and still others, like the plaintiff in *Buckley*, may have deliberately chosen not to register in order to make a political point, *see Buckley*, 525 U.S. at 195.

Whatever the explanation for the casting of 30,000 presidential ballots by unregistered voters, they are not sufficient to convince this Court that Connecticut's registration requirement constitutes a severe burden. After all, 75% of Connecticut's voting-age population has successfully registered to vote, and there is no allegation that the remaining 25% are concentrated in any particular social group. Thirty-thousand voters represent only about one percent of Connecticut's voting eligible population; that one percent were unable or unwilling to register in advance of election day does not suggest, let alone prove, that Connecticut's registration requirements are onerous or burdensome in any way.

Furthermore, according to Plaintiffs, in a best-case scenario with one-step EDR, same-day registration would have boosted turnout in 2000 by 130,000 individuals, representing just 5.5% of Connecticut's voting eligible population of 2,357,837 million.[8] Thus, according to Plaintiffs, the

---

[8] Neither party provided the Court with the number of Connecticut citizens over 18 who were actually eligible to vote in 2000, but the Court located this statistic on a website relied on by Plaintiffs' expert Professor Nagler, and it is provided only for the purpose of assessing orders of

registration deadline is only responsible for the non-voting of at most 5.5% of the eligible population. To accept the proposition that the inability of a small proportion of otherwise eligible individuals to meet the registration deadline transforms that deadline into a severe burden on First and Fourteenth Amendment rights would fly in the face of the Supreme Court's acknowledgment that "the State is justified in imposing a reasonable registration cutoff prior to any primary *or general* election, beyond which a citizen's failure to register may be presumed a negligent or wilful act forfeiting his right to vote in a particular election." *Rosario*, 410 U.S. at 765 (Powell, J. dissenting) (emphasis added) (cited in the majority opinion at 760). In sum, the evidence shows that Connecticut's registration deadline "d[oes] not prohibit the petitioners from voting . . . or from associating with the political party of their choice.  It merely impose[s] a legitimate time limitation on their enrollment, which [unregistered voters] cho[o]se to disregard." *Rosario*, 410 U.S. at 762.

Plaintiffs have further argued that the burden imposed by Connecticut's pre-election-day registration requirement is severe because it requires voters to register in advance of the time that most people focus their attention on an election. In support of this argument, Plaintiffs produced two experts who testified, without contradiction by the State, that many potential voters  begin to take an interest in elections only in the last two weeks of a campaign, during the period when media coverage sharply increases. The Court does not doubt that this testimony is surely correct, but Plaintiffs' argument misses the mark for three reasons.

First, as a threshold matter, Plaintiffs' empirical argument about media coverage and motivation to register was built around the fourteen-day registration deadline in effect at the time

---

magnitude not for determining figures with any precision. *See* Pls.' Ex. 131 at 2, Addendum to Expert Report of Jonathan Nagler, citing United States Election Project, http://elections.gmu.edu/Voter_Turnout_2000.htm.

this lawsuit went to trial. As explained above, under Connecticut's new seven-day deadline, the evidence from Plaintiffs' own experts indicates that voters will have had at least one week of good media coverage of an election before the registration deadline closes. In addition, the Court notes that Plaintiffs' experts acknowledged that their conclusions were applicable to voters in general, and were not based on studies devoted to the class of voters at issue in this case – namely, unregistered voters. The experts admitted that neither they nor anyone else knows much, if anything, about what motivates unregistered voters. In the absence of evidence specific to unregistered voters, this Court cannot conclude that Connecticut's registration requirement imposes severe burdens on those voters.

Second, Connecticut does not require a voter to decide in advance who they will vote for, or even whether they will vote. All Connecticut requires is that its citizens take reasonable and easy steps, now a mere week in advance of the election, to preserve the option of participating. Voters may decide at their leisure, and after reflecting on the information storm unleashed by the media in the final weeks, whether or not to turn out on election day, and in whose favor to cast a ballot. The Supreme Court has made it clear that it is reasonable to expect voters to take some steps to inform and involve themselves in electoral politics. *See, e.g.*, *Burdick*, 504 U.S. at 438 ("Reasonable regulation of elections *does not* require voters to espouse positions that they do not support; it *does* require them to act in a timely fashion if they wish to express their views in the voting booth.") (emphasis in original) (internal quotation marks omitted); *Tashjian*, 479 U.S. at 220 ("[O]ur cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues.") (internal quotation marks omitted); *Rosario*, 410 U.S. at 760 (upholding under a rational basis analysis an eight-month registration deadline for primary elections despite plaintiffs' assertion that the regulation "requires party enrollment before prospective voters have

48

knowledge of the candidates or issues to be involved in the next primary elections"). Requiring voters to think a week ahead and invest a minute or two in preserving their option to vote is surely just such a reasonable requirement.

Third, and in any event, the Supreme Court has already held that a candidate's or a voter's interest in deciding late rather than early whether to participate in an election is not a weighty interest. *See Burdick*, 504 U.S. at 437 ("[I]n *Storer* . . . we gave little weight to the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status . . . . We think the same reasoning applies here . . . [to] Hawaii's write-in vote prohibition.") (internal quotation marks and citations omitted).  Indeed, in *Marston*, the Court held that "a person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot." *Marston*, 410 U.S. at 680.

Accordingly, the Court concludes that Connecticut's seven-day registration deadline does not impose a severe burden on First and Fourteenth Amendment rights. Therefore, following the framework laid out by the Supreme Court in *Burdick* and reiterated by the Second Circuit in *Wit* and *Lerman*, the next and final question for the Court is whether the State has an important regulatory interest in the requiring its citizens to register seven days prior to a general election.

**2.    Does the State Have an Important Regulatory Interest in the Seven-Day Registration Cutoff?**

Where the burden imposed by a challenged election regulation on First and Fourteenth Amendment rights is not severe, "the State's asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 364 (1997) (internal quotation marks omitted). Furthermore, the Supreme Court has explicitly rejected the notion that a finding of constitutionality requires "elaborate, empirical

verification of the weightiness of the State's asserted justifications." *Id*. Assessing Connecticut's asserted justifications under this standard, the Court finds that Connecticut has several important regulatory interests that justify its refusal to adopt EDR. These interests can be grouped into two broad categories, which the Court will consider in turn.

*Preventing Fraud*.   "It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal." *Rosario*, 410 U.S. at 761; *see also Buckley*, 525 U.S. at 191 ("States . . . have considerable leeway to protect the integrity and reliability of  . . . election processes generally."); *Burdick*, 504 U.S. at 441 ("[T]he right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system."). As the Supreme Court put it in *Marston*, "States have valid and sufficient interests in providing for some period of time – prior to an election – in order to prepare adequate voter records *and protect . . . electoral processes from possible frauds.*" *Marston,* 410 U.S. at 680 (emphasis added). Plaintiffs do not gainsay the importance of this interest in the abstract, but contend that Connecticut's refusal to enact EDR on this basis is irrational for the following reasons: the State already allows voters in a primary election to register until noon on the day before the election; there is little electoral fraud in Connecticut; EDR would not increase fraud; and EDR might prove to be a more effective method of preventing fraud than Connecticut's current registration practices.

Plaintiffs' first argument, that Connecticut's seven-day registration cutoff for general elections is irrational because it allows voters in a primary election to register until noon on the day before the election, is rendered irrelevant by Plaintiffs' own insistence that anything short of election-day registration is unconstitutional, no matter how brief the cutoff period prior to the election.  Plaintiffs have also undermined their argument in their efforts to distinguish decisions

such as *Rosario* and *Clingman* – which concerned primaries.  Although Plaintiffs are correct that primary elections differ in certain practical respects from general elections, those differences do not result in a different constitutional analysis. Rather, the Supreme Court in *Burdick* made clear that because "[e]ach provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends," *Burdick*, 504 U.S. at 433 (internal quotation marks omitted), courts are to apply the same "flexible standard," *id.* at 434, to every challenge to a state election law. And in this case, "weigh[ing] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule," *id.* (internal quotation marks omitted), the practical differences between primary and general elections cut in favor of the State, not Plaintiffs. Defense witness Theodore Bromley, Staff Attorney in the Elections Division of the Office of the Secretary of the State, testified without contradiction that registration up until the day before a primary election is achievable because of "the relatively smaller number of people who seek to register and vote in primaries relative to general elections." *See* Def's Ex. 520. Neither party provided any statistics to illustrate this point, but according to statistics publicly available on the website of the Secretary of the State of Connecticut, only 36,286 Connecticut citizens voted in the primary elections held in August 2004, compared with 1,607,808 voters passing through the polls for the general election in November 2004.[9] The forty-four fold

---

[9] *Compare* Statewide Turnout for August 10, 2004 Primary *at*
http://www.sots.ct.gov/ElectionsServices/election_results/2004_Nov_Election/2004PrimaryRep
orts/2004StatewideTurnout.htm, *with* United States Election Project, 2004 Voting-Age and
Voting-Eligible Population Estimates and Voter Turnout *at*
http://elections.gmu.edu/Voter_Turnout_2000.htm.

difference in voter volume between primary and general elections would be sufficient to justify the legislature in concluding that the two types of election pose different problems regarding smooth administration and the potential for fraud, and therefore require different rules and regulations.

Plaintiffs' second contention, that electoral fraud is not a large problem under Connecticut's current regime, was largely (and happily for the voters of Connecticut) supported by the evidence at trial. According to the trial testimony of Mr. Garfield from the Elections Commission, there have been only approximately five substantiated cases of voter fraud per year over the last five years, though it should be noted that this witness also testified, without contradiction, that based upon his experience, more voter fraud occurs than is reported: "I think we have evidence that voter registration fraud is committed and as I indicated before, there's a lot more that we don't see because its difficult to detect and people don't tend to bring all the cases to us that exist out there."

In any event, the precise scale of Connecticut's voter fraud problem is irrelevant because, under the less exacting scrutiny applicable here, the State "is not required to wait until fraud becomes rampant before taking remedial action," *Barilla v. Ervin*, 886 F.2d 1514, 1524 (9th Cir. 1989) (upholding Oregon's 20 day registration cutoff), and need not provide "elaborate, empirical verification" of its concern, *Timmons*, 520 U.S. at 364. As the Supreme Court has instructed, legislatures " 'should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively.' " *Id.*, 520 U.S. at 364 (*quoting Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986)). Thus, it is sufficient that preventing voter fraud is a weighty state interest and that Connecticut has imposed a modest voter registration requirement to further that salutary goal.

52

Plaintiffs' third contention, that EDR would not increase fraud, rests on another claim, namely that those states that have introduced EDR have not experienced a surge in voter fraud. Quite apart from the fact that the Constitution surely does not require Connecticut to base its decisions on electoral policies on the experience of other states, the record indicates that the jury is still out on the impact of EDR on election fraud in at least one state – Wisconsin. The 2004 election in Wisconsin brought in excess of 70,000 election day registrants to the polls in Wisconsin, and also revealed a number of problems with respect to the casting and counting of votes in that State. Although Mr. Kennedy, Wisconsin's chief election official, testified that his twenty-six years of experience leads him to conclude that voter fraud is not a problem in Wisconsin, he admitted that fraud may go undetected, and that the reported discrepancy of several thousand between the number of votes cast and the number of recorded voters indicated that there had been serious problems in 2004. The preliminary reports of a joint task force confirmed this. Under these circumstances, the Connecticut legislature is surely within its legitimate right to be concerned about the potential for voter registration fraud that an EDR system might entail.

Plaintiffs also argue that an EDR system coupled with strong identification requirements, as proposed in the 2003 EDR Act vetoed by Governor Rowland, would actually be better at preventing fraud than Connecticut's current registration system. The record does provide some support for this argument.  Mr. Abbate, the President of Registrars' Association, testified that registrars are very concerned about the fact that the current system allows a voter to substitute a sworn declaration of identity and eligibility for actual identification. He further gave his opinion that the face-to-face aspect of registration under a system of EDR is a plus for fraud prevention.

However, both Mr. Abbate and Mr. Garfield testified to the anti-fraud utility of taking the time prior to an election to verify the identity of would-be voters by sending letters to the address

provided on the registration card. They also testified that although their organizations had supported EDR in 2003, this support had been contingent on the existence of a reliable electronic database of registered voters, and that serious negative experiences with Connecticut's CVR system since the development of the 2003 Act had shaken their confidence in the feasibility of EDR at this time. While there is every reason to believe that the software problems that caused past crashes have been addressed, only time will confirm this. Until the State has evidence that the CVR database will operate consistently and reliably without crashing during elections, the General Assembly is entitled to decide that EDR is not appropriate given the importance of the integrity of elections to the State and its citizens.

Furthermore, the State currently discourages fraud through challenges to the qualifications of a voter by candidates or other citizens. These challenges depend upon the pre-election-day compilation and publication to the citizenry, parties, and candidates of a list of registered voters. Although the lists produced by the current system may be somewhat incomplete, they are certainly far more comprehensive than would be the case under an EDR system that brought 15% of voters to the polls unregistered. While the record indicates that few challenges are ever made, the legislature is still entitled to value the challenge mechanism as a deterrent and as a means of involving the public in preserving the integrity, and the appearance of integrity, in its elections.

In the final analysis, even if Plaintiffs are correct that EDR, coupled with strong identification requirements, would deter more fraud than Connecticut's current framework for administering voter registration, the potential benefits of EDR plus strong identification requirements do not help Plaintiffs, because they have not limited their argument to a claim that only EDR with strong identification requirements is constitutionally required. Moreover, under the less exacting standard of review that applies in this case, the State need not demonstrate that it

has chosen the best or even better means of achieving its objectives, so long as its objectives are legitimate and important and there is a connection between those objectives and the State's voter registration requirement.  The evidence presented satisfies both prongs.

*Avoiding Election Day Chaos and the Appearance of Disorder*. "[I]t is beyond question that States may, and inevitably must, enact reasonable regulations of . . . elections . . . to reduce election- and campaign-related disorder." *Clingman*, 125 S.Ct. at 2039 (internal quotation marks omitted). This interest extends to protecting against even the appearance of disorder and concomitant vulnerability to impropriety. *Cf. Buckley v. Valeo*, 424 U.S. 1, 30 (1976) ("Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process . . . be eliminated.").

Professor Nagler and Mr. Kennedy both testified that adopting EDR may result in a  very large volume of voters registering on election day. Mr. Kennedy testified that about 15% of those who voted in Wisconsin in 2004 registered on election day, while, according to Professor Nagler, the proportion was 21% in Minnesota and 19% in Idaho. As explained previously,  if the experience of the EDR states is any guide, were Connecticut to adopt EDR over 200,000 Connecticut citizens likely would not register until they arrived at the polls on election day.[10]

These figures are potentially staggering in comparison to the approximately 30,000 individuals who voted by presidential ballot in 2000 and 2004, and reveal the massive scale of the EDR undertaking envisioned by Plaintiffs. In view of the fact that it took two election cycles in Connecticut to get the presidential ballot process running smoothly (the State having experienced

---

[10]  Even if one assumes that the increase in election-day registrants would be limited to the number of individuals encouraged to turn out by EDR, which would be between one and five percent of the voting-age population according to Plaintiffs, EDR would still be responsible for between 26,000 and 130,000 Connecticut citizens seeking to register on election day.

real difficulties meeting demand in the 2000 election), the State is justified in regarding with some alarm the prospect of such an increase in the number of previously unregistered voters seeking to register and cast ballots all on election day.

Of course, Plaintiffs argue that it is irrational for the State to allow all unregistered voters (rather than only those who missed the registration deadline due to migration into the State) to cast presidential ballots, but then refuse to introduce EDR. But this argument cannot be sustained in light of the difference in the volume of voters who cast presidential ballots and the number who, based on the experience of EDR states, would likely turn out to register under a system of EDR. That the State has experimented with wide access to the presidential ballot and made that process work for 30,000 voters cannot mean that it must be required to allow more than 200,000 voters to register on election day.

Furthermore, uncontradicted testimony at trial from Mr. Abbate and Ms. Tramontano indicated that on election day poll workers have their hands full simply ensuring that the voting process itself is running smoothly, without trying also to juggle the different tasks involved in getting voters through registration and to the voting booth. The State may reasonably decide that, in order to avoid long lines, frustration, and a confusion conducive to fraud, it will not provide an incentive for its citizens to delay registration until the last minute, but will instead reduce the burden on those entrusted with seeing that lines move quickly and votes are cast legitimately by requiring citizens to finalize registration before election day.

Predictably, Plaintiffs counter that the State can and must address the problems of scale caused by EDR by increasing the resources available to local registrars rather than by rejecting EDR. But the Supreme Court long ago rejected exactly this argument, confining to the dissent Justice Marshall's objection that Arizona had not justified its fifty-day registration cutoff by

showing "that it cannot, by better administration, eliminate the errors that justified a 50-day period in [the preceding election] . . . [or] that the recorders' staffs could not be increased temporarily." *Marston*, 410 U.S. at 683 (Marshall, J., dissenting). More recently, the Second Circuit similarly declined to tell New York how to spend its limited resources, holding that despite "abundant testimony that for relatively small sums of money . . . the State . . . could gain the computer capacity" to verify voter signatures, "[w]e cannot conclude that the burden imposed upon voters by the system as it now exists constitutionally requires the State of New York to expend both the money and human and other resources to alleviate that burden." *Schulz*, 44 F.3d at 59. At issue here are not only additional computers, but numerous additional staff to perform registration, at precisely the time when most registrars would rightly prefer to concentrate on making the voting process run as smoothly as possible.

Furthermore, even if the State were to increase staffing at polls to deal with the thousands of voters wishing to register, disorder and the potential for fraud might still persist due to a technological choke point, namely deficiencies in the performance of Connecticut's statewide electronic database of registered voters. Plaintiffs agree that a statewide electronic database is an important safeguard against fraud because it allows registrars to check for duplicate registrations on election day. However, it is undisputed that Connecticut's CVR system experienced continuous crashes during the final two days of the 2004 registration period, preventing look-ups for duplicate registrations and causing a serious backlog of registration data, and that similar performance problems beset the local elections held in May 2005. In view of the uncertainty surrounding the performance of the State's electronic database, it is perfectly legitimate for the General Assembly to impose a non-severe, pre-election-day registration requirement in order to

avoid the chaotic consequences of a computer crashes occurring while 200,000 voters or more are waiting to register and vote.

In closing, the Court would like to be clear that the data and scholarly commentary and testimony presented to the Court in support of EDR were impressive.  Also, it is undisputed that Connecticut's Secretary of the State, the State's Chief Election Official, believes that EDR is a sensible and desirable method of stemming the tide of falling voter turnout, notwithstanding the legislature's valid concerns about administrative capacity and fraud. However, it is not for this Court to decide what might make sense from a public policy viewpoint or what the Court might do if it were the legislature or the Secretary of the State. Having established that less exacting scrutiny applies because the burden of registration is not severe, an unelected judge may not "sift through the record to determine whether policy decisions are squarely supported by a firm factual foundation." *City of Cleburne*, 473 U.S. 432, 458 (1985) (Marshall, J., concurring in part and dissenting in part). In case after case, the Supreme Court has made it clear that the Constitution reserves to state legislatures the right to decide how best to reconcile ideas that excite a political science class with the often messy realities of administering elections, so long as the legislative interests are legitimate – which they are in this case – and the restriction imposed is reasonable and nondiscriminatory – which it is.

Over the past several years, the Connecticut General Assembly has engaged in just such a balancing of the interest in increased voter turnout against the practicalities of registering voters on election day itself. In 2005, the legislature enacted a compromise that reduces the registration cutoff from fourteen days to seven days, but does not go as far as allowing voters to "walk up to a voting place on election day and demand a ballot." *Marston*, 410 U.S. at 680.  Far from being unconstitutional, Connecticut's compromise reflects the kind of democratic give-and-take and

58

informed legislative balancing that Connecticut's citizens can rightly celebrate and the Constitution certainly does not condemn.  In sum, "[i]t may well be that . . . arguments [for EDR] will carry the day in some States' legislatures. But the Constitution does not require [Connecticut], and the . . . [42] other States that do not permit [EDR], to allow it." *Timmons*, 520 U.S. at 370.

### III.

Still pending before the Court are three motions in limine filed by Defendant. For the reasons stated above, Defendant's Motion in Limine to Exclude Testimony of Proposed Expert Minnite [doc. #57] is GRANTED, and Defendant's Motion in Limine Re: Proposed Fact Witness Lorraine C. Minnite [doc. #65] is DENIED.

Defendant's Motion in Limine to Exclude Certain of Plaintiffs' Proposed Exhibits [doc. #59], is GRANTED IN PART AND DENIED IN PART. The Court GRANTS the motion inasmuch as the Court will exclude from evidence Professor Minnite's expert report (exhibits 73 and 120), communications between Professor Minnite and Al Lenge (exhibit 110), and an email message from a non-party to Mr. Bromley (exhibit 27), because Professor Minnite was withdrawn as an expert and the communications and email message are therefore inadmissible hearsay. The Court DENIES the motion insofar as it requests exclusion of proceedings and testimony before the General Assembly's Government Administration and Elections Committee (exhibits 1, 3, 10, 12, 19, 21, 23, 26, 28, 29, 32, 43, 49, 50, 63, 68, 72, 91, 93, 101, 111 and 121) and exclusion of various publications regarding EDR (exhibits 7-9, 11, 15, 86 and 90). *See, e.g.*, Fed R. Evid. 703, 803(8), 801(d)(2)(D). Although admissible, the Court understands that many of these exhibits contain hearsay within hearsay and conclusory statements without reference to underlying facts. The parties should be assured that the Court has reviewed these exhibits with appropriate caution and has given them only as much weight as they deserve. In particular, the Court found the

hearing transcripts and EDR publications useful in providing the Court with background regarding EDR and the Connecticut General Assembly's consideration of its desirability over the years.

### IV.

For the foregoing reasons, the Court concludes that Connecticut's voter registration regulations are constitutional. **Therefore, the Court directs the Clerk of the Court to enter a final judgment in favor of Defendant and against Plaintiffs on all of Plaintiffs' claims, and to close this file.**

IT IS SO ORDERED.

/s/_____Mark R. Kravitz_____
United States District Judge.

**Dated at New Haven, Connecticut: <u>December 20, 2005</u>.**

60